WILLIAM BOWER, APPELLEE, V. CHICAGO & NORTHWESTERN RAILWAY COMPANY, APPELLANT.

FILED JUNE 23, 1914. No. 17,574.

1. **Evidence:** JUDICIAL NOTICE. The courts of this state will take judicial notice of the fact that the "Black Hills" are in South Dakota, and of the further fact that the western terminus of the main line of the Chicago & Northwestern Railway Company, running from Omaha northwest through the city of Long Pine, Nebraska, is in the Black Hills, in the state of South Dakota.

2. **Master and Servant:** INJURY TO SERVANT: INTERSTATE COMMERCE. And where the evidence shows that the western division of said railway company is known as the Black Hills division, the term "through trains," when applied by railroad men to trains in such division, will be construed to mean trains running through the division from one terminal point to the other.

3. ———: ———: ———. Evidence examined and set out in the opinion *held* sufficient to show that at the time he was injured plaintiff was engaged in interstate business, and that his action was properly brought under the Federal Employers' Liability Act of April 22, 1908. 35 U. S. St. at Large, pt. 1, ch. 149, p. 65.

4. ———: ———: NEGLIGENCE: SUBMISSION TO JURY. Evidence examined and set out in the opinion *held* sufficient to justify the submission of the question of defendant's negligence to the jury.

5. ———: ———: ASSUMPTION OF RISK: SUBMISSION TO JURY. Record examined, and *held* not to contain any evidence to require the submission of the question of assumption of risk to the jury.

6. **Trial:** INTRUCTIONS: CONTRIBUTORY NEGLIGENCE. The instructions upon the question of contributory negligence examined, and *held* not to contain any error of which defendant can complain.

7. **Damages:** INSTRUCTIONS. In an action for personal injuries, where the evidence establishes without contradiction that plaintiff's in-

juries are permanent, a clause in the charge to the jury, on the question of the measure of damages, that the jury, if they find for the plaintiff, may allow him for ''such prospective suffering and loss of health, if any, as the jury may believe from all the evidence before them in this case he will sustain by reason of such injuries,'' is not error, nor in conflict with the rule of this court that in such cases it is the duty of the court to instruct the jury that only such damages as are reasonably certain to result therefrom can be compensated by their verdict.

8. ————. Plaintiff was a locomotive engineer, 54 years of age. For three years prior to his accident he had been earning $157 a month. Within less than two months after the time of his injury he would have received a raise of salary to $175 a month. His injury resulted in the loss of an eye. Prior thereto he had been a man of robust health. *Held*, That a verdict of the jury for $11,500, which is sustained by the trial court, cannot be held to be so excessive as to call for a reversal of the judgment, or to warrant a reduction by this court.

APPEAL from the district court for Holt county: WILLIAM H. WESTOVER, JUDGE. *Affirmed.*

*A. A. McLaughlin, Edgar R. Hart* and *Wymer Dressler,* for appellant.

*M. F. Harrington, contra.*

FAWCETT, J.

Plaintiff was a locomotive engineer in the employ of defendant. On November 28, 1910, while engaged in filling the lubricator upon his engine, a glass attachment to the lubricator, which was surrounded by a metal shield, exploded and blew off the shield, which struck plaintiff in the left eye, causing an injury which necessitated the removal of the eye, for which injury he obtained a judgment in the district court for Holt county. Defendant appeals.

Defendant complains that the court erred in refusing to instruct the jury that, "under the pleadings and evidence in this case, plaintiff is not entitled to recover, and your verdict will be for the defendant." A number of reasons are urged in the argument why this instruction should have been given, one of which is that by his petition plain-

tiff based his right to recover upon the Federal Employers' Liability Act of April 22, 1908, and that there is no evidence in the record that plaintiff at the time he received his injury was engaged in interstate commerce, nor any evidence to show that the train, to which he alleges his engine was about to be attached, was so engaged. While the evidence of the interstate character of trains "3" and "6" is not as clear and satisfactory as it could and should have been made, we think it was sufficient to take the case to the jury on that point. Plaintiff testified that he had been hauling trains 3 and 6 for about three years, "3" running west, and "6" running east. "Q. These were what they call the through trains? A. Yes, sir." The witness Mackey testified that he had been an engineer for defendant 20 years, running on the "Black Hills division;" that the headquarters for that division is Chadron. The witness Walford testified to the same facts. The witness Collins testified that he was a locomotive engineer in the employ of defendant. "Q. On what division? A. On what is called the Black Hills division; that is, west of Long Pine. Q. Where is the headquarters of that division? A. Chadron." He testified further that he had been employed on the Black Hills division as an engineer for 21 years. We take judicial notice of the fact that the Black Hills are in South Dakota. We think we may also take judicial notice of the fact, well known to every citizen of even ordinary intelligence in the state of Nebraska, that the western terminus of defendant's road which runs through Long Pine is in the Black Hills. With these facts established, and the further fact established by the evidence that Long Pine is a division point on the Black Hills division, of which Chadron is the headquarters, the testimony of plaintiff that trains 3 and 6 were through trains meant that they were trains running through the Black Hills division, which would be from Long Pine to the Black Hills. Being such trains, they were interstate trains, engaged in interstate business, and plaintiff, when running his engine hauling one of those trains, or when upon his engine preparing it to be attached to one of such trains for the pur-

pose of hauling it would be engaged in interstate business. We think the evidence sufficiently shows that at the time he was injured he was preparing his engine to haul train No. 3.

It is further urged that the court erred in overruling defendant's motion for an instructed verdict made at the close of all the testimony. The ground of this motion was that all of the evidence given upon the trial failed to establish the acts of negligence charged against defendant in the petition, and that the evidence shows without contradiction or dispute that whatever risk there was incident to the use and operation of the lubricator upon his engine was one of the ordinary risks incident to his employment and assumed by him. This is the most important point in the case. The evidence shows that attached to each locomotive engine is a lubricator, and that as a part of such lubricator there is a glass attachment which is called by the witnesses "the lubricator." At the time of plaintiff's injury defendant was using two kinds of lubricators, one called the "Nathan," and the other the "Bull's Eye." The Nathan is a hollow tube, while the Bull's Eye is flat and solid. Plaintiff's engine was equipped with a "Nathan." Both lubricators were so connected with the boiler of the locomotive as to permit the steam pressure to force the oil through the lubricator and into the parts of the locomotive for which the same was intended. This was necessary because the engineer must be able to see at all times that the oil is dropping and that the lubricators are performing their functions. When in full use, either lubricator was required to sustain the same steam pressure as the boiler. The Nathan lubricator had been in use for over 20 years, and had been used on all of the engines of the defendant down to between two to four years before the time when plaintiff received his injury, when the Bull's Eye made its appearance. The evidence shows that the Nathan lubricator was liable to and did frequently break. The three conditions under which it was most liable to break were: (1) When it was first installed and before it had been thoroughly "tempered;" (2) when subjected to a

sudden change of temperature; and (3) after it had been
used for some time and had worn thin. Over each of the
Nathan lubricators there was a metal shield, divided in
the center by a spring which, by a simple movement of the
hand, could be removed from the glass lubricator or re-
placed. This shield was evidently designed to serve a
double purpose: (a) To prevent the glass from being
broken if anything hard should strike it; and (b) to pre-
vent injury to the engineer from flying parts of the glass
when a break occurred. When one of these tubes would
break it would be replaced by another, either by a man at
the roundhouse or by the engineer himself, if upon the
road. This, according to the evidence, would occasion a
delay to the train of from 12 to 20 minutes. The witnesses
all agree that the Bull's Eye is unbreakable; that is to say,
none of the witnesses, including a number of old engineers
and the foreman of defendant's roundhouse in Chicago,
had ever heard of one breaking. Whenever one of the
Nathan tubes broke it was the duty of the engineer to re-
port the fact to the proper official of the defendant. The
evidence shows that after the tube had been in use for some
little time it would occasionally wear thin. When it be-
came so worn the fact could be detected by the engineer,
and it would then be his duty to call for a new tube. That
plaintiff must have been a competent and careful engineer
is shown by the fact that in 25 years' service as an engi-
neer only three of these tubes had broken on engines being
run by him; the one that caused his injury, one three weeks
before that time, and the other seven years prior thereto.
As a witness he was very frank and candid. He testified
that he had never heard of any one being injured by the
breaking of one of the tubes; that he at all times believed
that the tube was strong enough to withstand the same
steam pressure as the boiler of his locomotive; that he
never thought there was any danger in using the tube;
that he had no fear of it. He was asked: "Q. Now, Mr.
Bower, can you think of anybody connected with the op-
erating part of the railroad that would know more about
that lubricator and the shield, and the danger connected

with the use of it on an engine, than an engineer that had
been using it for 25 years? A. No; I don't know as I do.
Q. And don't you think that at the time you got hurt you
knew as much about this lubricator and as much about
the danger of its use as any man in the service of the
Northwestern railroad? A. Well, I thought—it was my
understanding and I was always taught to believe the
glass would stand the pressure of the boiler. Q. And it
is a fact that this glass had been standing the pressure of
the boiler for three weeks? A. Yes, sir; that is the fact."
When Mr. Bower gave this testimony he gave it frankly,
feeling that he in fact did know as much about this lubri-
cator and the shield and the danger incident to the use
of it on an engine as anybody connected with the operat-
ing department of the railroad; but the testimony of de-
fendant's foreman of its roundhouse in Chicago shows that
in this Mr. Bower was mistaken. The witness Harner,
called by the defendant, testified that he lives in Chicago,
and is foreman of defendant's roundhouse at Fortieth
street in that city. On cross-examination he testified: "Q.
When did they first begin using the Bull's Eye lubricator?
A. To my knowledge about, I think pretty close to, three
years ago. Q. Didn't they use them in 1906 at Chadron?
A. Well, I wasn't (at) Chadron. Q. You weren't? A. No,
sir. Q. Your own personal knowledge is about three years?
A. Yes; about three years, or even less than that, if any-
thing. Q. What kind or class of engines were they using
them on? A. On the Q engines, when I first observed
them. Q. To what extent are the Bull's Eye lubricators
used on the Q engines now? A. Well, I don't know. Q.
Well, are they using this old Nathan lubricator on many
of the engines now? A. There is, I think, probably 25
per cent. Q. Of the engines that use the Nathan lubri-
cator? A. Yes. Q. About 25 per cent. of all of them?
A. I think so. You understand that is a rough estimate;
I have no means of knowing what other divisions might
have. Q. But in the division where you are at Chicago?
A. We are changing them; probably 75 per cent. is
changed. Q. That have the Bull's Eye lubricator now?

A. Yes; 50 to 75 per cent. * * * Q. When you say there is about 25 per cent. still using this old Nathan lubricator, that includes the big and little and all? A. Yes, sir. Q. Switch engines and everything? A. Switch engines, modern power, they have got Bull's Eye; they carry 185 pounds pressure. Q. Even the switch engines have the Bull's Eye? A. The new power all comes with Bull's Eye. Q. It is recognized as the proper appliance now, is it not? A. Yes, sir. Q. And has been for three or four years? A. I think so. Q. And this other class do explode —the Nathan? A. Well, they have been known to explode? Q. And hurt men? A. Sure. Q. And that is why you made the change. Isn't that the fact? A. Not necessarily so; that is one of the facts. Q. Another one is the breaking of the old class lubricator would delay the trains at times? A. Yes; that is another." On redirect he testified: "Q. All the new engines now are equipped with the new kind? A. Yes, sir; all our new modern power comes with Bull's Eye. Q. That has been true for several years? A. Yes, sir; ever since the Q came. Q. That was about three years ago? A. I think so; I think the Q engines came three years ago." This testimony by defendant's foreman establishes several important facts. It shows that the Bull's Eye is now recognized by the defendant as the proper appliance, and has been for three or four years; that all of the new engines of the class plaintiff was operating, engines of 190 pounds pressure, now come equipped with the Bull's Eye; that since the Bull's Eye made its appearance defendant had been changing this device on its engines by substituting the Bull's Eye for the old Nathan, and had made such substitution on about 75 per cent. of all of its engines, "big and little and all." A fair inference is that in making those changes they would devote their attention more particularly to the high-pressure engines, and if only 25 per cent. of all of their engines, "big and little and all," now have the old Nathan, it is, we say, a fair inference that by far the larger portion of that 25 per cent. would be low-pressure engines. It also discloses an important fact not

known to plaintiff when he said that he did not know of any one connected with the defendant who would know more about the danger incident to the use of the old style Nathan than himself. It shows that the company knew that the old Nathan would explode and "hurt men." When the witness testified that these old lubricators had been known to explode, and was asked, "Q. And hurt men?" he answered, "Sure." There is significance in the emphatic character of this answer. He further shows that that fact was one of their reasons for changing from the old Nathan to the Bull's Eye lubricator; the other fact being that the breaking of the old lubricators would delay the trains at times. It therefore appears that the defendant knew the old style lubricator, which it had been using for many years, was dangerous; that its employees who were using it were being injured by it; that there was another device in the market, which the defendant was using, that was absolutly safe, and yet it continued to permit plaintiff and other engineers in its service to use the dangerous device when it knew of and had in its possession a safe one, which could easily and cheaply be substituted. This does not come within the rule that a master is not obliged to use the best-known device. It presents the simple question whether a master may continue to use a dangerous appliance when it knows of and has at its command a perfectly safe one. This it cannot do. We therefore hold that the court did not err in submitting the question of defendant's negligence to the jury.

What we have above said disposes of the question of assumption of risk. The rule is now well established, not only in this state, but elsewhere, that a servant assumes only the dangers incident to his employment which are known to him, or which, by the exercise of reasonable care, he would know. The evidence in the record before us does not bring plaintiff within that class. He had used this device for many years; had never been injured himself, and had never heard of anyone else being injured. He "was always taught to believe" that the Nathan lubricator would withstand the same steam pressure as

the boiler of any engine he had used.  He had never heard of a break when the metal shield did not afford protection.  Had he known what the defendant knew, viz., that men were being hurt by the use of this device, and had then continued in the service without objection, there would be some foundation for a claim of assumption of risk.  Complaint is made that the trial court by its instructions withdrew the question of assumption of risk from the jury.  It is true that paragraph 4 of the instructions given by the court on its own motion failed to submit it, but it is also true that in other paragraphs the point was covered.  But, even if not submitted at all, it would not be error, for the reason that there is nothing in the evidence which would sustain a finding that plaintiff assumed the risk of danger in using this device.

On the question of contributory negligence, the court went farther in favor of defendant than it should have gone under the Federal Employers' Liability Act, as it gave the defendant the full benefit of its plea of contributory negligence.

A number of assignments are urged against the rulings of the court in the giving and refusal of instructions.  We have examined them carefully, and are unable to discover prejudicial error in any of them.  The only one to which we deem it necessary to refer is instruction No. 4, requested by the plaintiff, which reads as follows:  "If you find for the plaintiff you will allow him as damages such sum as will compensate him for the injuries he has sustained, not exceeding $31,750, which is the amount sued for.  The elements entering into damages are as follows: (1) The value of his time during the period that he was disabled by the injuries; (2) if the injuries have impaired Mr. Bower's power to earn money in the future, such sum as will compensate him for such loss of power; (3) such reasonable sum as the jury shall award him on account of any pain and anguish he has suffered by reason of his injuries; (4) such prospective suffering and loss of health, if any, as the jury may believe from all the evidence before them in this case, he will sustain by reason of such

injuries; (5) such sum as the jury may deem proper for the inconvenience of his going through life with only one eye." Subdivision 4 is the one complained of. Defendant cites *Chicago, R. I. & P. R. Co. v. McDowell*, 66 Neb. 170, and *Nixon v. Omaha & C. B. Street R. Co.*, 79 Neb. 550, together with cases from other courts, to the point that it is the duty of the court in instructing the jury as to any future damages that only such as are "reasonably certain to result therefrom" can be compensated by their verdict. These authorities are eminently sound, but they do not fit the instruction under consideration. In the *Mc-Dowell* case the court instructed the jury that, if they believed that plaintiff had suffered permanent injuries, it was the duty of the jury to estimate, as well as it can be done, the damages which he had suffered since the time of the injury by reason thereof, as well as what "he may hereafter suffer, if any." In the *Nixon* case the instruction told the jury that in determining the damages they had a right to consider the testimony as to physical pain and suffering, if any, endured by the plaintiff, "or which she may endure in the future as a result of the injuries received at the time complained of." We reversed the judgments in both cases for the reason that permitting the jury to allow for such damages as the plaintiff "may hereafter suffer" is a departure from the rule of reasonable certainty and opens the door for unrestrained speculation. The instruction before us is not subject to this criticism. It did not tell the jury that they might allow plaintiff for such suffering and loss of health in the future, as the plaintiff "may sustain," but it told the jury that they could allow for "such prospective suffering and loss of health, if any, as the jury may believe from all the evidence before them in this case he will sustain by reason of such injuries;" not that they may allow for such suffering as the jury "may believe" he may sustain, but for such suffering as the jury may believe "from all the evidence before them in this case;" that is to say, for such suffering as the jury find from the evidence in the case he "will" sustain, not such as he "may" sustain. The language of the instruc-

tion is positive, clear, and explicit, that the jury must be governed by the evidence in the case before them and allow the plaintiff for such future suffering only as he will actually sustain by reason of his injuries.

In *Chicago & N. W. R. Co. v. De Clow*, 124 Fed. 142, the circuit court of appeals for the Eighth circuit held: "A charge that a plaintiff could recover compensation 'for any pain and suffering he may be called upon to undergo in the future—that is, in case you find that he will suffer pain and suffering in the future'—is not error, in the absence of any suggestion or request for a modification or explanation of the instruction before the jury retires." On page 145 Judge Sanborn in the opinion says: "If the instruction that the plaintiff was entitled to compensation 'for any pain and suffering he may be called upon to undergo in the future' stood alone, without qualification by any other part of the court's directions to the jury, it would undoubtedly be erroneous. The authorities cited for the defendant go no farther. But this sentence did not stand alone. The court was evidently conscious of the inherent error in the unqualified statement it contained the moment it was uttered, and it instantly added: 'That is, in case you find that he will suffer pain and suffering in the future.' It is clear that the court made this qualification of its first statement for the express purpose of conforming its charge to the established rule. * * * The jury have found under this charge that the plaintiff will endure all the future suffering for which they have given him compensation. In order to reach the conclusion that the court was guilty of prejudicial error in this instruction, the presumption must be indulged that the jury have found that the plaintiff will endure future suffering that it was not reasonably certain from the evidence that he would sustain; that they have found that he will suffer what they were not reasonably certain that he would suffer. This presumption is too violent and irrational for us to raise. There is no such legal presumption. An appellate court cannot and ought not to create it, and there was no prejudicial error in this part of the charge."

It is further urged that the verdict is excessive, appearing to have been given under the influence of passion and prejudice. The verdict was for $11,500. Plaintiff was 54 years of age. For three years preceding his accident he had been earning $157 a month. On the 1st of January following the time of the injury—a period of a month and three days—plaintiff would have received a raise in salary to $175 a month. His expectancy of life, as shown by the Carlisle table, was 18.28 years; but his appearance upon the witness-stand and his previous good health may have satisfied the jury that he might reasonably be expected to live a much longer period than that. The expectancy of life, as shown by the Carlisle table, is not conclusive upon the jury. It is simply evidence which they have a right to take into consideration in arriving at their conclusion as to the probable expectancy of plaintiff's life. His injury was of so grave a character that he is forced to abandon the profession of his lifetime. He can no longer hold a position as engineer. He must go through life with one eye. During all that time he must suffer the disfigurement, discomfort, and other handicaps thus forced upon him. The jury, who saw him, fixed the amount of his compensation. An experienced trial judge has refused to set aside their estimate. We must decline to go into a mathematical computation to determine with exact nicety just how much compensation should be paid to a man for such a terrible injury.

Finding no prejudicial error in the record, the judgment of the district court is

AFFIRMED.