## ATLANTIC COAST LINE R. CO. v. WOODS.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1918.)

### No. 1567.

1. COMMERCE ⊜27(8)—FEDERAL EMPLOYERS' LIABILITY ACT—SUFFICIENCY OF EVIDENCE.

In a railroad employé's action for injuries under the Employers' Liability Act, evidence held to show that the bolt upon which plaintiff was working when injured was put on a particular engine, engaged in interstate commerce.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2.** COMMERCE &27(8)—FEDERAL EMPLOYERS' LIABILITY ACT—INJURY IN "IN-TERSTATE COMMERCE."

An engine regularly hauling interstate passenger trains was used in interstate commerce when taken out of a train in order that a bolt might be repaired, being placed in the shop and sent out upon the same day on its regular run, and the railroad's employé, injured in doing the work, was injured while employed in interstate commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Action at law by Robert A. Woods, by his guardian ad litem, against the Atlantic Coast Line Railroad Company. To review judgment for plaintiff, defendant brings error. Reversed.

See, also, 238 Fed. 917, 151 C. C. A. 651.

Lucien W. McLemore, of Sumter, S. C. (Douglas McKay, of Columbia, S. C., and P. A. Willcox, of Florence, S. C., on the brief), for plaintiff in error.

W. Boyd Evans and W. W. Hawes, both of Columbia, S. C., for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This case comes here on writ of error from the District Court of the United States for the Eastern District of South Carolina. The plaintiff in error will be referred to as defendant, and the defendant in error as plaintiff; such being the relative positions of the parties in the court below.

Plaintiff, while in the employ of the defendant company at its machine shops at Florence, S. C., operating a machine used to cut threads or bolts, sustained an injury resulting in a broken wrist. This action was brought to recover damages for defendant's alleged negligence as the proximate cause of such injury. It was tried at the March term of the Florence court, 1916, resulting in a judgment for plaintiff in the sum of $2,000, and was heard on a writ of error by this court at the November term, 1916. The judgment of the court below was reversed, and the case remanded for a new trial, on account of the refusal of the District Court to admit evidence in support of defendant's contention that the parties were engaged in interstate commerce at the time of the injury, and hence that the action should be controlled by what is known as the "Employers' Liability Act." Act April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1916, §§ 8657–8665). The second trial resulted in a verdict for plaintiff of $800, upon which a judgment was entered.

It is insisted that the court below erred in refusing to direct a verdict for defendant at the close of all the evidence upon the ground that the action is controlled by act of Congress known as the "Employers' Liability Act," and, not having been brought within two years,

was barred by section 6 of the act (section 8662). Two questions were submitted to the jury in the court below, to wit: (1) Was the U-bolt which was being prepared by plaintiff at the time he was injured put on engine No. 88? and (2) was this engine engaged in interstate commerce?

Defendant introduced several witnesses, who testified as to this transaction. However, we think the testimony of the witness Carter, defendant's assistant roundhouse foreman at Florence, is more to the point than that of the others. He testified in part as follows:

"Q. Did you or not know that there was a U-bolt to be threaded that morning? A. Yes, sir; by my orders there was one sent in there for 88. Q. Who was to thread it? A. The Woods boy; the man running the bolt cutter. Q. Robert Woods? A. Yes, sir. Q. What engine was that bolt to be used for? A. Engine 88. Q. How do you know it was for engine 88? A. Because I had it taken off engine 88 myself that morning. Q. When did you first know it was necessary to make a U-bolt for engine 88? A. Three days previous to this day. * * * Q. How did you happen to know, three days before this boy was hurt, that the U-bolt was needed on engine 88? A. Engine inspector report to me— Q. Don't state what the engine inspector said; did you see it that day? A. I saw it the morning it came in. Q. Morning of what day with reference to Wood's injury? A. That was the day he was injured. Q. When did you see it coming in? A. I saw it when it pulled in from Columbia. Q. What train? A. 54. Q. What is 54? A. Passenger train. Q. Running between what points? A. Wilmington and Columbia. Q. Was the engine taken off of that train that morning? A. Yes, sir; engine went out that night on 55. Q. What train is that? A. That is a train from Wilmington to Columbia."

Cross-examination:

"Q. You say you knew three days beforehand that this yoke had to be fixed? A. Yes, sir. Q. How did you say you knew it? A. Our engine inspector reported to me late in the afternoon. * * * Q. What was it he reported to you? A. The yoke broke, the rest here, and there is a key holding it up, and this was broken off flush with this. (Witness was illustrating with yoke used on trial.) Q. Do you know what time young Woods got hurt? A. No; I was not in there at the time. Bultman came to me about 11 or 11:30, and told me that the boy cutting that yoke for engine 88 had broke his arm. Q. Were you present and saw this yoke put on? A. I saw him finishing up the job. Q. Were you present and saw this yoke put on the engine? A. I saw him finishing up the job; I can swear he put that on 88. Q. You were there while he was putting it on? A. Yes, sir; while he was finishing it up."

Also witness Koopman was introduced by defendant and testified as follows:

"After yoke was repaired by Mr. Wade I threaded it. Accident was about 9 o'clock in the morning; am not sure, it was some time in the morning. The yoke threaded by me was the same one taken out of the machine after the accident to plaintiff and repaired by J. J. Wade. After Robert Woods was injured, I took charge of bolt cutting machine. I threaded the one Woods was working on. No other yoke was threaded that day. I was employed on the bolt cutter from time plaintiff was injured until he came back to work."

[1, 2] The court below submitted the question to the jury as to whether the engine on which this U-bolt was used was engaged in interstate commerce. Upon this point the defendant's evidence clearly establishes the fact that the bolt in question was put on engine

83. Indeed, plaintiff offered no evidence to the contrary. Therefore the next question is as to whether this particular engine was being used in interstate commerce. This point has been passed upon in many instances.

In the case of Norfolk & Western Railway Co. v. Earnest, 229 U. S. 114, 33 Sup. Ct. 654, 57 L. Ed. 1096, Ann. Cas. 1914C, 172, it appears that an employé was injured while piloting a locomotive (by walking ahead of it) through the railroad yard to a point where the locomotive was to be attached to an interstate train to assist in moving it up a grade to the next station. The court in that case held that the employé was engaged in interstate commerce. However, in this instance it cannot be said that the employé was directly engaged in interstate commerce. Nevertheless he was performing work which was necessary to the preparation of the engine which had been and was to be used in such commerce.

In the case of Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, the plaintiff was injured while a dining car was standing on the siding between the time when it was taken out of an interstate train and placed there and the time when it was removed by another interstate train on the return trip. The third syllabus in that case is in the following language:

"A dining car regularly engaged in interstate traffic does not cease to be so when waiting for the train to make the next trip."

Also in the case of Northern Pacific Railway Company v. Maerkl, 198 Fed. 1, 117 C. C. A. 237, the Circuit Court of Appeals for the Ninth Circuit passed upon a question analogous to the one here presented. The first syllabus in that case reads as follows:

"Where an employé of defendant, an interstate railroad company, was injured, in part through the negligence of a fellow servant, when working in repair shops connected with an interstate track, engaged in repairing a car used by defendant indiscriminately in both interstate and intrastate commerce as occasion required, defendant was at the time 'engaged in interstate commerce,' and the employé was employed by defendant in such commerce, within the meaning of Employer's Liability Act April 22, 1908, c. 149, § 1, 35 Stat. 65 (U. S. Comp. St. Supp. 1911, p. 1322 [Comp. St. 1916, § 8657]), and an action for his injury or death may be maintained against defendant thereunder."

The following cases are very much in point: Bower v. Chicago, etc., R. Co., 96 Neb. 419, 148 N. W. 145; Lloyd v. Southern Ry. Co., 166 N. C. 24, 81 S. E. 1003; Law v. Illinois Central Railway Co., 208 Fed. 869, 126 C. C. A. 27, L. R. A. 1915C, 17; Southern Pacific Railroad Co. v. Pillsbury, 170 Cal. 782, 151 Pac. 277, L. R. A. 1916E, 916; Baltimore & Ohio Railroad Co. v. Darr, 204 Fed. 751, 124 C. C. A. 565, 47 L. R. A. (N. S.) 4.

It is true there are cases in which it has been held that where more than one inference may be drawn from the evidence, or where the facts are in dispute as to whether the parties are engaged in interstate commerce the same should be submitted to the jury. These cases are not analogous to the case at bar. As we have already stated, it is established by uncontroverted evidence that the U-bolt which was

being prepared by plaintiff at the time he was injured was to be put on engine 88, which was engaged in interstate commerce. This fact is not controverted by any of the witnesses who testified at the trial.

It is insisted by counsel for plaintiff that the case of Shanks v. Delaware, Lackawanna & Western Railroad Co., 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797, clearly sustains the contention of plaintiff. While the railroad company in that case was engaged in both interstate and intrastate commerce, it maintained a repair shop where locomotives engaged in such commerce were repaired. Shanks sustained the injury of which he complained while employed in the shop. It appears that his usual work consisted in repairing parts of locomotives, "but on the day of the injury he was employed solely in taking down and putting into a new location an overhead countershaft—a heavy shop fixture—through which power was communicated to some of the machinery used in the repair work." The Supreme Court in passing upon that case propounded the following question:

"Was the employé at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?"

The court there held that the plaintiff was not engaged in interstate commerce, and, among other things, said:

"Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car, or other instrument then in use in such transportation. What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation. This, we think, demonstrates that the work in which Shanks was engaged, like that of the coal miner in the Yurkonis Case, was too remote from interstate transportation to be practically a part of it, and therefore that he was not employed in interstate commerce within the meaning of the Employers' Liability Act."

We think the case at bar is easily distinguished from the Shanks Case. In the case of Delaware, Lackawanna & Western Railroad Co. v. Yurkonis, 238 U. S. 439, 35 Sup. Ct. 902, 59 L. Ed. 1397, it appears that the plaintiff was employed in a coal mine, where the coal mined was to be used in hauling interstate commerce. The Supreme Court held in that case that the plaintiff was not engaged in interstate commerce. Also in the case of Minneapolis & St. Louis Railroad Co. v. Winters, 242 U. S. 353, 37 Sup. Ct. 170, 61 L. Ed. 358, Ann. Cas. 1918B, 54, the Supreme Court held that the plaintiff was not engaged in interstate commerce at the time of his injury. There the engine had been employed both in intrastate and interstate commerce. The court in disposing of the case among other things, said:

" * * * It does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and go on. It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen."

The case at bar, as we have stated, is distinguishable from the cases relied upon by counsel for plaintiff, inasmuch as the engine was taken

out of interstate commerce for the express purpose that it might be repaired to enable it to continue as an instrument of interstate commerce. In other words, it is easily distinguished from the Winters Case because the character of the work in which the engine in this instance was employed did not depend "upon remote possibilities or upon accidental later events." It appears from the evidence that engine 88 was regularly engaged in hauling interstate passenger trains, operating under a rule of the road by which it reached Florence every three days. It further appears that on the day plaintiff was injured this engine was taken out of the Columbia-Wilmington train in order that the U-bolt in question might be repaired. It also appears that the engine was placed in the shop and sent out upon the same day on its regular run, hauling what is known as the Columbia-Wilmington train.

There being no conflict of evidence as to whether the plaintiff at the time of his injury was engaged in repairing an instrumentality destined for use in interstate commerce, and it appearing that more than two years had elapsed from the date of plaintiff's injury before the commencement of this action that the same is barred by section 6 of the Employers' Liability Act, the court below erred in refusing to direct a verdict in favor of defendant.

For the reasons stated, the judgment of the lower court is reversed.

WOODS, Circuit Judge (dissenting). The plaintiff, Robert A. Woods, an employé, recovered judgment for personal injuries against Atlantic Coast Line Railroad Company for $800, on July 30, 1917. The District Judge overruled a motion made on behalf of the defendant to direct a verdict on the ground that the plaintiff was engaged in interstate commerce at the time of the injury, that more than two years had elapsed after the injury before the action was brought, and that therefore the action was barred by the statute. After refusing the motion, the District Judge submitted to the jury the question whether the injury was received while the plaintiff was employed in interstate commerce, and gave the instruction that if he was, the verdict should be for the defendant.

The sole question before us is whether the only reasonable inference to be drawn from the evidence was that the plaintiff was engaged in interstate commerce. I think it clear that the question should be answered in the negative. The plaintiff was operating a machine to thread bolts used on eccentric yokes or straps. The bolts when cut were thrown into a pile and used indiscriminately for engines drawing intrastate and interstate trains. The evidence tends so strongly to show infliction of the injuries while cutting a bolt for engine 88 that I assume that it was. This engine, on the morning of the day of the accident, January 25, 1913, had drawn the train running from Columbia, S. C., to Wilmington, N. C. In accordance with the usual custom, it was laid off at Florence, S. C., a junctional point which was the end of its run; the bolt was taken from it, repaired, and restored to the engine, which, after remaining in Florence all day, was at that place attached to a train the same evening, running from Wilmington to Columbia.

252 F.—28

The evidence makes it clear that at the time of the accident, the engine was not actually engaged in drawing an interstate train, was not on its way to be attached to such train, and was in no way appropriated or designated as an engine used especially for interstate commerce. J. J. Wade, blacksmith in the railroad shops at Florence, testified that:

"Engine 88 was a passenger engine, running either between Florence and Wilmington, or Florence and Columbia."

The following questions and answers appear in the testimony of T. J. Carter, assistant roundhouse foreman:

"Q. What sort of service was 88 in at that time? A. Passenger service, between Florence or Charleston, Columbia, and Wilmington. Q. And where did it come from that morning? A. Came from Columbia. Q. And stopped at Florence? A. No, sir; went to Wilmington; the engine stopped at Florence, that engine; the train went on to Wilmington 20 minutes after arriving at Florence. Q. But I am talking about the engine that this new bolt went on. A. That engine stopped at Florence. Q. That was the end of that engine's run? A. Yes, sir; end of the engine's run. Q. That engine ran between Columbia and Florence? A. Columbia, Florence and Charleston. Q. And the balance of the train was pulled on by another engine to another place? A. Yes, sir. Q. But this particular engine ran between Columbia, S. C., and Florence, S. C.? A. Yes, sir. Q. And that was the end of the engine's run when it got to Florence? A. Yes, sir. Q. Upon which this bolt you are talking about was put on? A. Yes, sir. Q. And then that engine lay there all day, did it not? A. Lay there from 8:45, about 9 o'clock, when it came into the shop, until about 5:30 in the evening, when we sent the engine out. Q. And then came back to Columbia? A. Yes, sir. Court: Q. Those are interchangeable for engines of the same class? A. Yes, sir. Q. You say the terminal points of this engine were Columbia and Florence? A. Between Charleston, Columbia, and Florence, and sometimes we used it to Wilmington; it was not any special terminal, but that is where she is supposed to run."

There was not a particle of evidence to show that when the engine was detached from the Columbia-Wilmington train, the railroad authorities had any formed intention as to the next use to be made of it. The engine was not interrupted in an interstate haul, to be repaired and continued on its trip. At the time of the repairs, it was not engaged in any business, either state or interstate. After being detached for repairs, its next work, so far as the evidence shows, might have been between Columbia and Charleston, or Wilmington and Columbia, with the probabilities in favor of the Columbia and Charleston trip, rather than the Wilmington and Columbia trip, for the testimony was that it was more often used on the intrastate trip. It was one of a class of engines interchangeable for other engines of the same class for any of these trips. In short, at the time of the accident its office as an instrumentality of interstate commerce had ceased, and it was entirely uncertain, at the time of the accident and the repair of the bolt, whether it would be next used in interstate commerce or intrastate commerce.

It is unnecessary to enter into an analysis of the many cases on the subject, and the refined distinctions necessarily made between interstate and intrastate commerce. The facts of this case bring it clearly under Minn. & St. L. R. Co. v. Winters, 242 U. S. 353, 37 Sup. Ct. 170, 61 L. Ed. 358, Ann. Cas. 1918B, 54. In that case the court says:

"The agreed statement is embraced in a few words. The plaintiff was making repairs upon an engine. This engine 'had been used in the hauling of

freight trains over defendant's line. * * * which freight trains hauled both intrastate and interstate commerce, and * * * it was so used after the plaintiff's injury.' The last time before the injury on which the engine was used was on October 18th when it pulled a freight train into Marshalltown, and it was used again on October 21st, after the accident, to pull a freight train out from the same place. That is all that we have, and is not sufficient to bring the case under the act. This is not like the matter of repairs upon a road permanently devoted to commerce among the states. An engine as such is not permanently devoted to any kind of traffic, and it does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and go on. It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen. At the moment it was not engaged in either. Its character as an instrument of commerce depended on its employment at the time, not upon remote probabilities or upon accidental later events."

The utmost that the defendant could claim was submission to the jury of the question whether the plaintiff was employed in repairing part of an engine engaged in interstate commerce. The conclusion of the jury that it was not so engaged was well supported by the evidence above quoted.

I think the judgment should be affirmed.