WILLIAM R. DAILEY ET AL., APPELLEES, v. SOVEREIGN CAMP, WOODMEN OF THE WORLD, APPELLANT.
FILED OCTOBER 14, 1921. No. 21667.

1. **Negligence:** INJURIES TO ELEVATOR PASSENGER: LIABILITY. When the owner of a building employs an unskilled and inexperienced person to operate a passenger elevator therein and personal injuries are inflicted upon another without his fault by reason of the operator's inexperience and lack of skill, the owner will be held liable in damages for such injury.

2. **Appeal:** CONFLICTING EVIDENCE. Where the testimony conflicts with respect to material matter, the verdict will not be disturbed, when there is sufficient evidence to support it, unless the verdict is clearly wrong.

3. **Damages.** There is no fixed or exact rule known or recognized in our system of jurisprudence in which the same measure of damages for personal injury may be applied to all cases alike. Much must be left to the good sense and reason of the jury.

4. ——: ELEMENTS. In an action to recover for personal in-

juries, the physical pain, the mental anguish and the humiliation that is suffered by plaintiff, and the permanency of the injury, and the decreased purchasing power of money, are all proper elements of damage to be considered by the jury in deliberating upon their verdict.

5. **Carriers:** OPERATION OF ELEVATOR: CARE REQUIRED. The owner of a passenger elevator that is installed in his building for the use of tenants and the public is bound to use the same degree of care with respect to those using the elevator that is imposed upon common carriers.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Affirmed on condition.*

*Gaines, Ziegler, Van Orsdel & Gaines, De E. Bradshaw* and *Brome & Ramsey,* for appellant.

*Kennedy, Holland, De Lacy & McLaughlin, contra.*

Heard before LETTON, DEAN, ALDRICH and DAY, JJ., GOOD, District Judge.

DEAN, J.

William R. Dailey sued to recover damages for personal injuries sustained by reason of defendant's alleged negligent operation of a passenger elevator in its 17-story office building situated at Farnam and Fifteenth streets in Omaha, known as the Woodmen building. He recovered a verdict for $52,000. On defendant's motion a remittitur of $1,069 was filed, that sum representing certain alleged medical and hospital expenses which plaintiff was unable clearly to establish. Judgment was thereupon rendered in plaintiff's favor for $50,931, and defendant appealed.

On the part of plaintiff the evidence tends to show that July 19, 1919, while he was in the prosecution of his business as a salesman and solicitor for an Omaha stationery company, he went to the Woodmen building at 10:30 in the forenoon to call upon his employer's customers, and while he was stepping into one of six passenger elevators operated by defendant, and before gaining an entrance, the conductor started the car at a high rate

of speed, thereby causing him to lose his balance and fall. In an effort to save himself from injury he grasped the ascending floor of the elevator and was carried rapidly upward, coming in violent contact with the upper part of the iron shaft enclosure. From that point he was swept from the car and fell into the elevator shaft, a depth of 20 or 25 feet, striking iron beams and the cement floor at the bottom of the pit and thereby sustaining the injuries of which he complains.

On this feature of the case plaintiff's testimony in substance is that when he approached the car he paused a moment to allow a lady to enter, and that he immediately followed. He testified: "I proceeded to enter it; got my right foot in, and was in the act of bringing the left foot in, when the elevator started up with a sudden jolt, and threw me down, just simply threw me right down, then slipped out of the elevator, the elevator doors still being open, feet slipped out, the elevator moved upward, and both of my feet slipped off, curled in under the elevator, and dropped into the pit." Plaintiff further testified that the door of the car was open when he started to enter and the elevator was standing still. He said there was no car starter in the corridor that day when the accident happened, though he had seen one there when in the building on former occasions.

There is evidence tending to prove that defendant employed an unskilled, inefficient and inexperienced young lady, a novice, to operate the elevator car, and that the accident was caused by her negligence in starting the car before she closed the door and while plaintiff was in the act of stepping inside, and that she failed to stop the car immediately upon plaintiff's failure to gain an entrance. On this point she was called by plaintiff as a witness and testified that the day of the accident was the first time she operated the car alone; that the operators were supposed to close the doors of the cars before starting; that she started the car on the trip in question at a high rate of speed without closing the door; that she estimated the

door was three feet ajar when Dailey tried to enter; that almost immediately she saw him sliding off the car; that the car was hard to operate and older operators had warned her to be careful with it.

With respect to plaintiff's injuries the physician who first attended him immediately after the accident testified: "I found distortion of the left foot, due to a fracture at the junction of the lower and middle third of the left tibia and fibula; an incised wound about one and a half inches in length. Q. Go ahead. A. And one inch in breadth at the middle third of the inner aspect of the right tibia; an abrasion of the skin over the lower and inner portion of the right patella; * * * a slight amount of rigidity over lower left abdomen; an incised wound just below the posterior and anterior superior spine; no fracture of the spine, in my opinion; skin abrasion on the right jaw; skin abrasion on the right nipple; skin abrasion on both hands and the left forearm just below the elbow on the anterior aspect; abrasion of the skin of the back, extending from the middle of right scapula down the entire length of the back to the gluteal muscles; scalp wound about the size of half a dollar, just below the occiput. Q. Just state to the jury what the appearance of the left leg was at the time you examined Mr. Dailey. A. The left leg was distorted, turned outward, due to a fracture of both bones at about the junction of the lower and middle third of those bones. Q. That is, the left foot was turned outward beginning at a point about two-thirds of the distance below the knee? A. Yes, sir. Q. What did that disclose in the way of bone injury? A. A fracture. Q. What sort of a fracture did you discover this to be? A. Comminuted fracture. * * * Q. What did the rigidity of the left side of the abdomen indicate to you, if anything? A. Indicated severe trauma, in my opinion; at that time it was significant of hemorrhage. Q. Internal hemorrhage? A. Yes, sir. Q. Did the patient, Mr. Dailey, seem to be suffering from shock at that time? A. Yes, sir." The doctor further

testified that there was fracture of the fifth lumbar ver-
tebra and "a separation of the symphysis pubes, which
are the two bones that come down in front, making this
arch in the lower part of the abdomen here; that is the
separation. Q. That is the pelvic arch? A. Yes, sir;
pelvic arch. Q. Describe what further you found. A. I
found an obliteration, or practical obliteration, of the
obturator foramen; which is a ring over all the arches of
these bones; the separation in the left side of this arch
causes a pushing up of this bone, obliterating that fora-
men. Q. This part of the pelvis? A. Yes, sir. * * *
Q. Did you finally operate on Mr. Dailey? A. Yes, sir.
Q. When did the operation take place? A. September 1,
1919. * * * Q. What was the nature of that opera-
tion? A. Bone graft of the tibia. Q. That is the bone
of the lower leg? A. Yes, sir. Q. What was the pur-
pose of that operation? Why was that operation neces-
sary? A. To secure union of the fracture. * * *
From the fracture—this bone, was broken in several
pieces and the two shafts of the bone overriding, caus-
ing a shortening; those pieces were removed, and a piece
of bone taken from the upper portion of the shaft of the
bone. * * * The leg was iodized, that is, sterilized
with iodine, and removed immediately with alcohol; an in-
cision is made over the anterior aspect of the tibia here
through the skin and fascia, that is, the covering under-
neath the skin; the bone is made bare, and with a twin
saw that is run by electricity a piece of the bone is taken
out from above this fracture covering a distance of about
four and a half or five inches, and the saws continue to
cross this fracture." The witness testified that plaintiff's
leg was placed in a plaster cast and he remained in the
hospital three and a half months; that his leg was short-
ened not quite an inch, and that it was permanent. "The
junction of the symphysis, in order to regain the normal,
will necessitate another operation. As to the amount of
permanency of disability there will be, that will have to
be determined a little later. As to how much bone ab-

sorption will take place there in a man of Mr. Dailey's age, as to the amount of immobility around the ankle joint and the knee joint, will have to be worked out, but, in my opinion, around the knee joint and the ankle joint will be 30 per cent. totally impaired." The doctor further testified that another operation upon the bones surrounding the ankle would in time become necessary.

Two surgeons were called in consultation. They testified that they assisted in the examination of plaintiff, using an X-ray as an aid. With respect to the injuries, their evidence substantially corroborates that of the physician whose evidence is detailed herein. One physician testified that plaintiff was ill about a month from an attack of pneumonia that he contracted because of low physical resistance that resulted from his injuries. This doctor said that he suffered great pain while under his care; that he lost weight and became emaciated; that he was delirious at intervals and could not speak above a whisper. The hospital nurse who had him in charge from July 19 until September 30 testified that when plaintiff was brought into the hospital he had symptoms of shock, and syncope, and had bruises all over his body; that his back was "black and blue all over;" that his hands were cut up; that he was unable to move himself at all without great pain; that he could not sleep at night and was delirious at times and very weak; that when it was necessary to move him she did it with assistance; that he was placed on "a fracture bed" with his left leg placed between sandbags keeping it in one position so that it could not be moved; that he suffered pain in the pelvic region; that the pelvic bone on the right side was very much bruised; that they administered opiates to quiet him and to make him sleep; that they injected about three quarts of salt solution into his chest to sustain him and for a number of days they could not get his pulse; that in a case of this character in which there is weakness, the salt solution "is about the last resort that we have." She further testified that plaintiff "was bruised

from the top of his head and below the pelvic region;" and that he had "a bruise on the right leg;" that he was unable to talk above a whisper and became very much emaciated; that part of the bone was taken from his left leg and grafted into the place where the break occurred; that owing to weakness they had to have a "cradle" over the bed to keep the pressure of the bed clothes from his body.

Plaintiff's wife testified that they had been married 15 years, and that he was in the employ of one firm during all of that time; that he had not known a day's illness during their married life; that she was summoned to his side about an hour and a half after the injury; that he recognized her, but could not speak; that he was not removed from the hospital for about two and one-half months; that when he arrived at his home he was placed in bed, where he lay propped up with pillows more than a week; that he was unable to move himself; that his suffering was severe in the back and pelvic region; that subsequently she obtained assistance of a neighbor and they moved him from the bed to a chair, where he could sit at a table for about a half hour, when he would become faint and dizzy and was compelled to return to his bed; that it was more than a month after he returned home before he could sit up all day; that his condition was such that he was unable to be clothed until January 1, and about that time the cast was taken off, and in the meantime he was taken to the hospital to have X-ray pictures taken; that when the cast was removed his leg was swollen from the top of the cast to his body; that when the cast was taken off she procured crutches for him and a splint was put on his leg for protection; that if his injured foot touched the floor he almost fainted and he was compelled to return to his bed; that at night he was unable to change his position in bed and she had to turn him over every half hour, and that at the time of the trial she testified that she had to change his position two or three times in the night; and that up to the time of the

trial he had never been able to turn on the fractured side and that she had never seen him put any weight on that side; that when he tried to do so or to put his left foot to the floor he became faint and it became necessary to put him back in his bed; that he complained greatly of soreness and suffered great pain.

Defendant denies that it was negligent. It introduced testimony tending to prove that plaintiff negligently attempted to enter the elevator after it began to ascend, and that to gain an entrance he seized the doors, which prevented them from closing, and tried to jump in while the car was in motion; that he missed his footing and in falling seized the floor of the car with his hands and from thence he dropped into the bottom of the elevator shaft; that the speed of defendant's elevators in question is controlled by a device located in the building, and that the operator has only indirect control of the speed by signaling to the man in charge of the controlling device, and that the doors of the elevator close automatically when the car begins to rise. There is also testimony going to show that the operator of the elevator made certain material statements in a deposition soon after the accident that were less favorable to plaintiff than those she made at the trial and that were in part contradictory of those statements. She frankly stated that her recollection of the facts was better at the trial than it was soon after the accident. Her testimony though, as one of plaintiff's witnesses, was a matter of credibility for the jurors. It may be said that, with respect to the scene of the accident and the occurrences immediately attending that catastrophe, the evidence of the witnesses who were called by the respective parties is in direct conflict. But that too was a question of credibility and the jury evidently accepted the version of plaintiff and rejected that of defendant, so that, under the rule, where there is sufficient evidence to support the verdict it will not be disturbed by us unless it is clearly wrong.

Plaintiff testified generally that the pain he suffered

Dailey v. Sovereign Camp, W. O. W.

was intense and almost continuous; that his nights were sleepless and full of anguish; that his physical condition became so impaired and his vitality was so low that his life was despaired of; that, in the expectancy of impending death, a minister of the gospel was called to his bedside to administer the last rites while he was yet in the hospital; that he has never been able at any time since the accident to rest with any degree of comfort in one position for any length of time; that it was only shortly before the trial that he was able to lie down even on one side, and that in no position, either night or day, could he remain more than a half or three-quarters of an hour without experiencing intense pain; that he could not move his injured foot without help, and at the time of the trial was able to move about only by the aid of crutches, and even at that time could not press his left foot to the floor.

The defendant contends that, even if it was guilty of negligence, the verdict is greatly excessive. It points out that plaintiff, who was 45 years of age when the accident occurred, had an expectancy of about 24½ years, and that at the time he was earning $23 a week. Plaintiff, however, testified that he had "a commission arrangement on outside business." From the facts so pleaded by defendant it argues that in no event should the judgment be in excess of $13,000 or $14,000. *Bower v. Chicago & N. W. R. Co.*, 96 Neb. 419, is a like case wherein we refused to fix "with exact nicety just how much compensation should be paid." We adhere to the rule there announced.

There is no fixed or exact rule known or recognized in our system of jurisprudence in which the same measure of damages for personal injury may be applied to all cases alike. As has often been said, much is left to the good sense and reason of the man in the jury box. *Fishleigh v. Detroit United Ry.*, 205 Mich. 145; *Southern R. Co. v. Bennett*, 233 U. S. 80. The law gives to the jury the right to determine the amount of recovery in cases of personal injury. That is, of course, one of its func-

tions, and, if the verdict is not so disproportionate to the injury as to disclose prejudice and passion, it will not be disturbed.   It will be noted, however, that the present case was tried and the verdict rendered in a period, that has not yet passed, when the purchasing power of money for necessaries generally was about half that which prevailed only a few years prior thereto, and the jury no doubt took this circumstance into consideration.   But from the record before us and in view of verdicts that have been sustained in this and in other states, in cases involving injuries substantially like those in the present case, we conclude that the verdict is excessive in the sum of $10,000.

*Union P. R. Co. v. Connolly,* 77 Neb. 254, was decided by this court in 1906.   We there held that a verdict of $27,500, recovered as damages for an injury resulting in the amputation of both legs about five inches below the knee, was not excessive.   True, Connolly was only 31 and his expectancy was 33½ years.   But in his case, appalling and horrible even to contemplate, the pain and suffering could hardly have been greater than plaintiff's, whose injuries are in large part internal.   Besides, it is obvious that Connolly's capacity to engage in useful and profitable employment would be even much greater than the plaintiff can hope to enjoy.   The mental anguish and physical pain that plaintiff herein has suffered and that he continued to suffer, and the permanency of the injury, the humiliation, and the medical assistance and personal attention that his physical condition will require, and the decreased purchasing power of money, are all proper elements of damage for the jury to consider.   Cases are cited in the *Connolly* case showing that, even in the first decade of the present century and prior thereto, when from a financial viewpoint the times were normal, substantially like verdicts, in the light of the facts therein depicted, were held not to be excessive.

The evidence seems clearly to support the allegation of plaintiff with respect to the negligence of defendant.   In

the elevator lobby, where three elevators are installed on each side, it was shown ·that defendant ordinarily employed a starter. At the time of the accident it appears that the starter was not in the lobby. The elevator that inflicted the damage was under the control of a young lady, as hereinbefore noted, who was unskilled, and who began her work as conductor that morning without having had previous experience. She testified that she signaled for power at the highest speed when she should have signaled for the lowest. She substantially corroborated the evidence of plaintiff's testimony with respect to the manner in which the injuries were inflicted. The evidence on this feature of the case, taken in its entirety, discloses negligence on defendant's part. In *Quimby v. Bee Building Co.*, 87 Neb. 193, we held that the owner of a passenger elevator, installed in his building for the use of tenants and the public, is subject to the same degree of care with respect to those using the elevator that is imposed upon common carriers. In *Kentucky Hotel Co. v. Camp*, 97 Ky. 424, the court say: "The owner and manager of an elevator for passengers is to be treated as a public carrier of passengers, and is subject to the same responsibilities as a railway passenger carrier. Therefore the law holds him to the utmost diligence and care of very cautious persons, and responsible for the slightest neglect." In *Tousey v. Roberts*, 114 N. Y. 312, it is said: "An elevator in a building, for the carriage of persons, is not supposed to be a place of danger, to be approached with great caution; on the contrary, it may be assumed, when the door is thrown open by an attendant, to be a place which may be safely entered without stopping to· look, listen or make a special examination." In *Blackwell v. O'Gorman Co.*, 49 Atl. 28 (22 R. I. 638), it is said: "Starting an elevator while the door remains open, and while a passenger is entering the car, is negligence." To substantially the same effect is *Mitchell v. Marker*, 62 Fed. 139.

The judgment in the present case is one of the largest

in amount that has ever been awarded for personal injuries in this jurisdiction, and it may be added that the record presents the most serious personal injuries that have at any time been presented to this court. In view of this fact a comparison of verdicts that have been heretofore rendered in personal injury cases is of little assistance. The rule is well settled that in this class of cases it properly comes within the province of the jury to take into account the purchasing power of money with respect to the commodities that are in use by the public generally and that may reasonably be said to constitute the necessaries of life. *Lincoln Gas & Electric Light Co. v. City of Lincoln*, 250 U. S. 256; *Seaboard Air-Line Ry. v. Miller*, 5 Ga. App. 402; *Louisville & N. R. Co. v. Williams*, 183 Ala. 138; *Noyes v. Des Moines Club*, 186 Ia. 378; *Hays v. United R. Co.*, 183 Mo. App. 608; *Hurst v. Chicago, B. & Q. R. Co.*, 280 Mo. 566.

Defendant finally argues that, the jury having made an excessive award as compensation for medical and hospital expenses, proves that it was not guided by the evidence. A remittitur of the excess in the sum of $1,039 was filed by the plaintiff. In *Kriss v. Union P. R. Co.*, 100 Neb. 801, we held that in such case where a remittitur is filed the error is cured. Defendant also makes complaint with respect to the giving of certain instructions. Upon examination we conclude that they do not present reversible error. The court did not err in overruling defendant's motion for a new trial.

The Megeath Stationery Company, plaintiff's employer, was made a party plaintiff, and is interested in the suit from the fact that it has paid to plaintiff compensation under the provisions of the workmen's compensation law. The company asks that it may be subrogated to the rights of plaintiff to the amount of such compensation as it may have paid him in accordance with the provisions of the act in question. From the record it appears that the prayer of the company should be and it hereby is granted. It is therefore ordered that the Megeath Stationery Com-

pany be subrogated to plaintiff Dailey's rights in the judgment in the amount of the compensation that it has paid him under the act. For the purpose of arriving at the amount of money so paid, the parties, or any of them, may, if so advised, submit further testimony to the district court.

The judgment is that, if plaintiff Dailey files a remittitur in the sum of $10,000 within twenty days, the judgment will be affirmed for $40,931. Upon his failure to do so, a reversal will be granted and a new trial ordered.

AFFIRMED ON CONDITION.