ESTELLA MAY TRUTE, ADMINISTRATRIX, APPELLEE, V. DALE HOLDEN, APPELLANT.

FILED MAY 3, 1929   No. 26479.

*Reavis & Beghtol, Jay C. Moore, Brogan, Ellick & Raymond* and *Charles A. Dafoe,* for appellant.

*Jack, Laughlin & Vette, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON and EBERLY, JJ., and BLACKLEDGE and REDICK, District Judges.

BLACKLEDGE, District Judge.

This was an action in the district court for Johnson county commenced by Estella May Trute, as administratrix of the estate of William Trute, deceased, plaintiff, and against Dale Holden, Lionel Elza Shurtleff, and the city of Tecumseh, defendants. The suit was instituted to recover for the alleged wrongful death of plaintiff's intestate. Before submission to the jury, the city of Tecumseh and the defendant Shurtleff were dismissed from the case, and the case was submitted to the jury upon the issues and evidence as between the plaintiff and the defendant Dale Holden.

The plaintiff alleged in substance that she was the duly qualified administratrix of the estate of William Trute, deceased, and was also his widow, and that she and a son, 20 years of age, were the only next of kin of the deceased. Plaintiff further alleged that on July 3, 1926, the defendant

Holden wrongfully shot and killed said William Trute, who before his death was an able bodied man capable of earning $1,200 a year, that he contributed all his earnings to the support of his next of kin, and that certain expenses for medical and surgical treatment and funeral expenses had been incurred, and she asked for a recovery in the sum of $26,000. The answer of the defendant Holden was a general denial.

It appears without conflict in the evidence that Trute and his wife resided at Tecumseh, and that on the occasion a Fourth of July celebration was in progress; that the defendant Shurtleff was a special police officer appointed by the governor, and that he had deputized the defendant Holden to assist him upon the occasion in question, in which their principal purpose seems to have been to look for violations of the liquor law. They discovered a jug of liquor concealed in a barn, otherwise unoccupied, on the premises occupied by the Trute family, and upon its discovery Shurtleff went to interview the proper county officers for the purpose of procuring a search warrant, and left the defendant Holden to guard the liquor and with instructions to arrest and hold any one coming for it until his return. The liquor was partly concealed at the foot of the stairway on the ground floor of the barn. At the suggestion of Shurtleff, Holden took his position up a flight of stairs in the loft of the barn. Holden was a young man 22 years of age, of rather slight build, weighing approximately 140 pounds. Trute, the deceased, was a man 48 years of age, by occupation a carpenter, 5 feet 10 or 11 inches in height, physically strong, and weighed approximately 200 pounds.

Much of the record is devoted to a disclosure of the fact that there was considerable feeling existing in reference to the enforcement of the prohibitory law, that there was probably some hard feeling between the deceased Trute and the officer Shurtleff, who had before that time come into contact with each other, and the record discloses an atmosphere of rather intense feeling between many of the parties concerned.

The conflict in the testimony as to the actual occurrence begins with the transactions which took place in this barn as between the deceased and the defendant Holden. The deceased, William Trute, was wounded by a shot from a revolver which Holden had, and, after receiving the wound, both he and Holden walked to the Trute residence, where Trute waited until Holden caused a physician to be called and soon others gathered there. Trute died of the wound July 5.

The physician, Dr. Fitzsimmons, upon administering to the wounded man, determined that he should be taken to a hospital, and, after calling for an ambulance, inquired of him how it had happened. Within a few minutes Mrs. Trute arrived and also inquired of her husband how it had happened. During this time the defendant Holden was present. It was stated by William Trute, as related at the trial by both Dr. Fitzsimmons and Mrs. Trute, that when he entered the barn a light was flashed down on him from above and he was commanded to hold up his hands; that he asked who was there and, receiving no answer, started up the stairway and was shot down. This is the theory of the plaintiff's case as disclosed by this testimony and by the brief of her counsel in this court, wherein they say that it was the theory of the plaintiff that the deceased was shot by defendant as he went up the stairway to the loft, defendant crouching near the head of the stairs; and, in another place, "he courageously started up the stairway to see who was unlawfully trespassing on his premises and without further warning received a fatal wound."

It was the theory of the defendant that the wounding of the deceased occurred in the barn loft after the deceased had ascended the stairs and in a struggle between himself and Trute in which the deceased was endeavoring to wrest from Holden the pistol which he held in his hand, and that in the struggle the defendant Holden having his flash-light in one hand and the pistol in the other, it was accidentally discharged resulting in the wounding of William Trute.

This is an outline of the principal issues as between the parties. The case was tried and submitted to the jury upon

these theories. A verdict was returned signed by ten jurors awarding the plaintiff a recovery of $13,150. The trial court upon the motion for a new trial required a remittitur to be made of $4,400, and thereupon overruled the motion for a new trial and entered judgment for $8,750, from which the defendant Holden appeals.

Appellant makes in this court ten assignments of error. The first three, that the verdict is not sustained by the evidence, that it was the result of passion and prejudice, and that the judgment is excessive, may be considered together. The eighth assignment has to do with instruction No. 4 which was given by the court upon request of plaintiff. In view of the conclusions reached upon these propositions, we do not consider it necessary to discuss the other assignments of error.

It is urged that the statement made by William Trute as to how the shooting took place could not be true, and for these reasons: It appears without contradiction that the bullet entered Trute's body in the region of the navel and passed backward and upward, without encountering any hard tissue or bones which might have deflected its course, and was found just under the skin near the spine at a point more than two inches higher on the body than the point of entrance, and that this fact conclusively precludes any inference that the shot came from above downward as would be the case if Trute was shot when starting or ascending the stairs; also, that early the following morning the sheriff and two assistants upon examination of the barn loft found in the northeast corner thereof the cap worn by William Trute and near the center of the loft the hat worn by defendant Holden; also, that the stairway went up adjacent to the south wall of the barn; and that the trousers worn by Trute showed a powder burn on them where the bullet had entered, and in experiments later made it was established that a similar powder burn appeared when the muzzle of the revolver was held not more than nine inches from the goods, but at a distance of twelve inches or more no powder burn appeared.

The only attempted reconcilement of any of these facts with the statement of Trute, that he was shot while starting or ascending the stair, was by the testimony of Dr. Fitzsimmons to the effect that, "if he should be at the top of the stairs and Mr. Holden was crouched under the wall and fired from the distance he would fire, the bullet would pass through at the point where it showed about in William Trute's body." This statement or supposition, however, is in conflict with the plaintiff's theory of the case and the testimony concerning Trute's *ante mortem* statement on which it is based. That statement is clearly to the effect that he started up the stairs and was shot. This statement of the witness is but a supposition as to what could have happened if the parties were in a position in which nobody on either side claims they were when the shot was fired. There is no explanation attempted of how, if the plaintiff's theory is true, there could be the powder burn on the trousers or the hat or cap found as located in the barn loft. It is true that, a fatal shooting having taken place, the inference would be that it was unlawful, and in the absence of any explanation as to how it occurred that inference might be sufficient to support a finding. The only other evidence as to what actually did occur at the time is the testimony of the defendant Holden, and it is corroborated by these undisputed physical facts which at the same time tend to show that the statement of Trute, as testified to by the witnesses who heard it was not correct.

There is a mass of testimony concerning the earnings of William Trute and the portion thereof contributed to the support of his family, involving collaterally an inquiry whether Mrs. Trute had complained of his nonsupport and domestic difficulties between them on that ground, all of which was perhaps properly submitted to the jury and need not be noticed here further than to note that, although the plaintiff contends in her brief that the evidence shows he earned approximately $1,000 a year, the trial court found and states in a memorandum opinion that the verdict was grossly excessive and placed a *post mortem* value on plain-

tiff's intestate far in excess of his living worth, and that the largest annual earning that the plaintiff was able to actually prove was $400.

The verdict in favor of the plaintiff was for $13,150. It, of course, was attacked in the motion for new trial, and a large part of the record is devoted to the showing made as to alleged misconduct of the jury. This need not be noticed here, except the fact that immediately after the verdict was received one Knowles made an examination of the jury-room, finding ten slips of paper, apparently ballots, on each of which was written an amount in figures. These varied in sums from $2,500 to $20,000, and there is also an additional slip on which each of these amounts is written, the total ascertained and a division made by ten giving the result of $13,150. The verdict was rendered by ten jurors and this amount so ascertained was the exact amount of the verdict. We do not overlook the rule established in this court concerning quotient verdicts. Nevertheless, that rule does not make these facts to be of no significance whatever, and we think that the affidavit of the foreman of the jury in attempted explanation fails to help the situation out to any extent. It rather appears to be an instance of one undertaking to see how closely he can walk to a precipice without actually stepping over, and while not basing our determination of the case upon this single proposition, we feel that it, in connection with the other facts disclosed by the record, is entitled to serious consideration and that it contributes materially to the final result.

In the submission of the case to the jury we note the complaint made as to the giving of instruction No. 4 on the request of the plaintiff. The court had in instruction No. 3 undertaken to cover that phase of the case and we think had sufficiently done so by instructing the jury as follows:

"It appears from the evidence that Lionel E. Shurtleff, the deputy state sheriff, called the defendant Dale Holden to assist him in apprehending violators of the prohibitory law in the state of Nebraska, and that, after receiving information which indicated that there might be intoxicating liquor

on the premises occupied by William Trute, Shurtleff, and the defendant Holden, without a search warrant, entered a barn on the premises of Trute and found what they determined was a jug partly filled with intoxicating liquor, that Shurtleff left to get a search warrant and directed the defendant to stay in the barn and watch for the person who came for the liquor, that the owner thereof might be detected and arrested.

"If you believe from the evidence that while defendant Holden was watching the liquor William Trute came to the barn, and that the defendant Holden told Trute to hold up his hands, and that thereafter Trute ascended the stairs and advanced upon defendant Holden for the apparent purpose of injuring him and attempted to take the revolver from him by force, and in the scuffle which ensued the revolver was accidentally discharged and produced the death of William Trute by accident and without fault of the defendant and without the intent of the defendant to discharge the revolver, you should find for the defendant.

"If you should find that the defendant Holden unnecessarily and intentionally killed William Trute, you will find for the plaintiff. The issue in this case under the pleadings and the evidence, gentlemen, is whether the shooting was accidental or intentional.

"If William Trute, after entering the barn, on being told to hold up his hands, asked who it was and received no response thereto and started up the stairs to ascertain who was there and was purposely shot by the defendant Holden, such shooting would not be justified and the defendant Holden must respond therefor in damages.

"The defendant Holden was rightfully in the barn seeking to apprehend a violation of the liquor law, but he had no right to shoot William Trute merely because he caught him violating the liquor law. Defendant is civilly responsible for the death of Trute if Trute died as the result of a gunshot wound wrongfully inflicted by defendant, even though defendant did not intend to actually kill Trute. One must respond in damages for the injury caused by his wrongful

act even though the exact result was not intended. When an injury is caused by violence to the person by the use of weapons the intent to injure is presumed and can only be rebutted by a showing that the injury was accidental, justifiable or excusable under the circumstances."

Conceding that instruction No. 3 correctly stated the law applicable, and we do not notice any particular fault to be found with it other than the clause, "but he had no right to shoot William Trute merely because he caught him violating the liquor law," which does not seem to have any logical or proper place in the instruction, it fully covered the issues and stated to the jury that "the issue in this case under the pleadings and the evidence, gentlemen, is whether the shooting was accidental or intentional." As the case was tried and submitted to the jury, that was indeed the only issue in the case.

Notwithstanding this situation, the court then upon the request of the plaintiff gave instruction No. 4, which is as follows:

"You are instructed that, even if you believe from the evidence that the jug partly filled with liquor and put in evidence was in the barn of William Trute with his knowledge or even that it belonged to him, it could constitute nothing more than a mere misdemeanor on his part and did not in itself in any way authorize or justify defendant Dale Holden in shooting William Trute, and no lawful authority to shoot William Trute on account thereof could be given to him by the defendant Shurtleff."

The vice in this instruction is not only that it substantially repeats and emphasises the questionable clause contained in instruction No. 3, above referred to, but in addition instructs the jury that this misdemeanor on the part of Trute did not in any way authorize or justify the defendant in shooting Trute, and states that no lawful authority on account thereof could have been given to him by the defendant Shurtleff. It is true, as contended by the appellant here, there was no issue in either the pleadings or evidence which raised any question of justification or claimed authority or

right on the part of the defendant Holden to shoot Trute because of his possession of liquor or for any other reason; and there was no claim by the defendant of any authority given or attempted to be given to him by Shurtleff for that purpose. This instruction is not only inconsistent with No. 3 in its statement to the jury that the only issue was whether the shooting was accidental or intentional, but it injects into the case issues not pleaded and as to which there was no evidence to warrant the giving of the instruction. A closer analysis of the language of the instruction indicates that it might not unreasonably be held to have another vice in that it assumes that the defendant Holden did shoot Trute. To say that one shot another implies a voluntary act; and the whole case of the defendant was upon the theory that the shooting was not voluntary or intentional, but was involuntary and unintentional. The instruction did not even say that these circumstances *would* not authorize a shooting, but assumes both the fact and the shooting and necessarily implies some claim of authorization or justification. The wording is: *"Did* not in itself in any way authorize or justify defendant Dale Holden *in shooting* William Trute."

"The instructions of the court should direct the attention of the jury only to facts in support of which evidence has been introduced upon the trial. When an instruction is not founded upon the evidence, and is calculated to mislead the jury in considering the facts of the case, the judgment must be reversed." *Mannion v. Talboy,* 76 Neb. 570. To the same effect is *Sabin v. Cameron,* 82 Neb. 106, and *McCormick Harvesting Machine Co. v. Willan,* 63 Neb. 391, and as long ago as the time of *Meredith v. Kennard,* 1 Neb. 312, it was said by Mason, C. J.: "When, as in this case, it plainly appears the court, in charging the jury, gave instructions not required nor called for by any evidence, and it appears that such unnecessary charge was calculated to, and we think did, mislead the jury in considering the facts of the case, the judgment ought to be reversed."

We find that this instruction was erroneous and the giving thereof sufficient to work a reversal of the case.

Concerning other aspects of the case to which reference has been made in this opinion, while we do not wish to be understood as now holding that either of the things criticized, if standing alone, would be adjudged sufficient grounds for reversal, yet we do believe they point unmistakably to a verdict that in justice ought not to be permitted to stand. It is, of course, for the jury to determine the weight and sufficiency of the evidence. But when it appears that the jury have failed to respond truly on the real merits of the controversy and to administer substantial justice to the parties in the case, and that the conclusion reached by the jury is, upon the record as made, manifestly wrong, then the court should not hesitate to set aside the verdict that the case may be resubmitted to another jury. *Garfield v. Hodges & Baldwin,* 90 Neb. 122; *Tyler v. Hoover,* 92 Neb. 221; *Parker v. Wells,* 68 Neb. 647.

Upon the record in this case we do not think the erroneous verdict could be cured by the mere filing of a remittitur. Although the trial court was of the opinion that the plaintiff should have a judgment for some amount, it found that this verdict as returned was grossly excessive. If its finding as to the largest annual earnings of the deceased is correct, then we think the judgment remains excessive even after the remittitur. The manner in which the verdict was returned, although there may have been no previous agreement to be bound by the quotient so obtained and although a confirmatory ballot was afterwards taken, does not indicate that the jury gave to the case that consideration in respect to the determination of their award which they were directed by the instructions of the court to give, and which the law contemplates and requires.

The result so reached, and in view of the evidence and undisputed physical facts to which reference has been made, all have cumulative weight in convincing the court that the judgment of the trial court should be reversed and the cause remanded, which is accordingly done.

REVERSED.