CHARLES H. RICH, APPELLEE, V. C. M. DUGAN ET AL., APPELLANTS.

280 N. W. 225

FILED JUNE 17, 1938. No. 30359.

*Cleary, Suhr & Davis,* for appellants.

*Davis & Vogeltanz, contra.*

Heard before GOSS, C. J., EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ., and BLACKLEDGE, District Judge.

DAY, J.

This is an action for damages for injuries resulting from an altercation between Rich and Dugan on April 21, 1936, brought by Rich against Dugan and his employer, the International Harvester Company. Both the employee and the employer appeal from a judgment of $1,475.

The employer insists that it is not liable because the alleged assault was not within the scope of the employment

of Dugan. Ordinarily, an employer is liable to a third party for an assault by an employee while acting within the scope of his employment.

The general rule applicable is in 3 C. J. S. 186, sec. 255. It states that the proper inquiry to determine whether the tort was within the scope of an agent's employment is: "Was the act done in the course of the agency and by virtue of the authority as agent with a view to the principal's business." It cites and quotes from *Rochester-Hall Drug Co. v. Bowden,* 218 Ala. 242, 118 So. 674, as illustrative of a proper test as to whether an act is within the scope of an agent's authority. It is there said: "If an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment. * * * Such conduct, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment."

In Restatement, Agency, sec. 229, the rule is stated as follows: "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: * * * (b) The time, place and purpose of the act; * * * (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; * * * (i) the extent of departure from the normal method of accomplishing an authorized result." Other considerations mentioned in that work are not quoted here because they are not applicable to the facts in our case. However, an interesting comment is made in this work as follows: "An assault by one employed to recapture a chattel, while entirely different from the act which he was employed to do, which was merely to take possession of the

chattel, may be within the scope of employment, unless committed with such violence that it bears no relation to the simple aggression which was reasonably forseeable." Restatement, Agency, sec. 229, comment (b).

Seavey, who succeeded Mechem after his death in 1928, as reporter for the American Law Institute on Agency, and continued the work until publication in 1933, formerly wrote upon this question as follows: "A master is liable for all the acts of a servant performed within the general scope of the servant's authority and for general purpose of serving the master's business. * * * What is within the scope of employment is often a difficult question and can be answered only by reference to the agreement between the parties, the custom of business and the necessities of the occasion. * * * The injured person must prove affirmatively that at the time of the injury the servant was engaged upon the particular occupation for which he was employed. * * * It means that he is liable for results where the employee, in endeavoring to perform an act within the general scope of his employment and doing an act of the general nature for which he is employed, causes injury to a third person. If this is found, the fact that the servant disobeyed orders, made a mistake, or even committed a crime, does not prevent the employer from being liable. He may be liable also even though the employee is guilty of a wilfully wrongful act, performed with the intention of doing harm to a third person, if performed in the course of employment and with some purpose in mind of achieving the general object for which he was employed." 2 Neb. Law Bulletin, 10.

This court has had occasion to consider this question before in a number of cases. In *Davis v. Houghtellin,* 33 Neb. 582, 50 N. W. 765, one Allen Ireland was employed to guard certain feed upon the defendants' premises and carelessly shot and killed a third party. A demurrer to the petition was sustained and affirmed by this court, because the petition did not allege that the deceased was molesting the feed, and did not, therefore, come within the scope of

the employment of the servant in guarding the feed. This case supports the view that the employer would not be liable unless the employee had acted to carry out the purpose of his employment.

*Crounse v. Booth Fisheries Co.*, 111 Neb. 6, 195 N. W. 462, recognized the rule heretofore quoted from various authorities, and decided the case upon a question of pleading. In that opinion the court stated: "We are unable to find an allegation that would connect the beating that plaintiff received which would even remotely tend to bring it within the scope of the agent's employment, nor did it come within any duty which he owed to his employer."

Again the question was before the court in *Zaitz v. Drake-Williams-Mount Co.*, 107 Neb. 262, 185 N. W. 424, and the court then said: "It is well settled that, when the act complained of is within the scope of the agent's employment, the master may be liable if the servant performed the act with a view to the service for which he was employed." It was held in that case that the facts did not bring it within the rule, and the court affirmed a verdict directed for the employer.

Not long ago this court held in *LaFleur v. Poesch*, 126 Neb. 263, 252 N. W. 902, that the employer was liable for all employee's acts in the execution of the business within the scope of the employment.

In view of the authorities, we announce the rules of law applicable to this case. An act that is incidental to the duties authorized is within the scope of the employment. In determining whether or not an act is incidental to authorized conduct so that it is within the scope of employment, the surrounding facts and circumstances, together with the nature of the employment and the conduct of the employee, will be considered.

Under the facts in this case as disclosed by the record, Dugan was employed as a collector for the International Harvester Company. He went to Rich's farm about a tractor upon which there was a balance due. Dugan had previously negotiated a settlement of the matter, but the

company had not accepted the proposition. It desired additional security, which Rich was unwilling to give. Dugan proposed to take the tractor, upon which the company already had a chattel mortgage securing its indebtedness. The negotiations between Rich and Dugan had been friendly. Rich proceeded to unfasten a manure spreader which he was using so that the tractor might be driven away. Dugan explained that he had no choice in the matter except to take the tractor. While the evidence is in dispute as to the happenings after the manure spreader and the tractor had been disconnected, it appears that an argument arose as to taking certain articles off the tractor which had been put thereon by Rich. In any event, a fight took place between Rich and Dugan. In this affray Dugan knocked Rich down. After Rich got up and the fight was over, Dugan presented a paper, which is said to have been a bill of sale for the tractor, and Rich signed it. Dugan then drove to another farm and left the tractor at Rich's place for several hours and then returned and told Rich it was too late to remove the tractor that day, and stated he would leave it there until the next day. The fight was incidental to Dugan's attempt to collect or remove the tractor from Rich's farm, and was within the scope of his employment with the International Harvester Company. The assault occurred during the process of removing the tractor, the very reason which caused Dugan to go to Rich's farm in the first place. Immediately after the struggle, he presented a paper for Rich to sign. Rich signed the paper, and later consented that the tractor might remain on the premises over night. The only business of Dugan on the farm was to repossess the tractor, and he was attending to it until after the fight and until after the paper had been signed. The assault was not committed with such violence that it bears no relation to the authorized act. It may be stated as a rule that when an employee authorized to repossess a tractor commits an assault in the accomplishment of the purpose, as in this case, it is incidental to the act authorized and within the scope of his employment so that the employer is liable.

When Dugan called at the farm on the 21st of April he was accompanied by two men, Mr. Mingus and Mr. Kezor, who lived as neighbors not far distant from the home of Rich. The testimony of the affray is given by Rich, by his wife, who was in the house and from the nature of things saw very little, and by Dugan, Mingus and Kezor. Rich testified that Dugan started the trouble, while Dugan, Mingus and Kezor state that Rich was himself the aggressor. The undisputed evidence indicates that they were both rather heated, and that the provocation was at least rather inconsiderable. Because of the conflict in the evidence it is difficult to determine who was the aggressor. The jury, after hearing the evidence, must have determined this matter in favor of Rich. However, it is clear that the unpleasant occurrence took place while Dugan was in the act of repossessing the tractor.

The appellant complains about the admission by the trial court of exhibit 1. This exhibit consists of some six papers, a note and a mortgage signed by Rich to the International Harvester Company, which was tendered in settlement but not accepted by the company, a note renewal report, a carbon copy of a letter written Rich by the company, a report and worksheet belonging to Dugan, and a paper with some figures on it. This statement indicates that the papers were worthless. But they were a part of the transaction because they were handed by Dugan to Rich during the controversy. The appellants were responsible for these papers at the time. These papers were material if they rendered any help in the determination of the controversy. Their admission does not seem to be prejudicial, because the testimony of both parties referred to them and the contents. But it is stated in the appellants' brief that the appellee called unnecessary attention to the blood spots on the exhibit. It is averred that these were referred to and emphasized at frequent occasions. An examination of the exhibit reveals that it is not so gory as to impassion or inflame a jury. There is a small soiled spot on one of the papers that the appellee testifies is blood. The evidence in

the case establishes that there was an altercation, and that as a result Rich's eye was blackened and that his nose bled. Even if the exhibit should have been excluded by the trial court and the ruling was erroneous, this court has long been committed to the view that an error is not sufficient grounds for reversal unless prejudicial. *Holman v. Stull,* 130 Neb. 876, 267 N. W. 149, and other cases on this subject.

Instructions 13, 14 and 15 are said to be erroneous. The appellant International Harvester Company complains particularly about instructions 14 and 15 because they set out the liability of an employer for the wrongful act of his employee. These instructions do not appear to be erroneous, although they are not discussed here because the subject-matter has heretofore been mentioned. Instruction 13 dealt with the subject of self defense, and this also interested the appellant Dugan. An examination of the instructions together with the facts of the case discloses that the instructions are not prejudicially erroneous.

The most serious objection is that the verdict is excessive for the damages resulting from the injuries as disclosed by the evidence. The amount of the judgment was $1,475. The undisputed evidence is that the appellee had a black eye and a bloody nose. There was a physician who testified as an expert as to the injuries he believed were the result of the struggle. While this testimony as to the condition of the nose does sound formidable when described in his technical terms, he does state in his testimony that the condition of the nose can be cured. The nose was alleged to have been pushed out of shape and slightly awry, but the jury could see the nose, and expert testimony as to the shape was not necessary. Dr. Barta also testified that he examined Rich about three days after the occurrence, and then about a week later, and that his nose and eyes were better. He examined the appellee again on September 22, 1937. He testifies as to an impaired vision of the eye, and gives measurements to establish this condition. However, he had never examined the eyes prior to the altercation, and there is no evidence that the vision was more than

temporarily impaired as a direct result of the affray. The appellee was a man fifty-one years of age, and his vision might not be expected to be that of a younger man. After all, the appellants are not liable, except for the damages resulting from the conflict between Rich and Dugan.

Dr. Roy D. Martin, of the Foote Clinic of Hastings, also testified as an expert after an examination of the appellee. He stated that he found no pathological condition in either eye due to a blow. He also stated that the condition of the nose was one found very frequently, and that it was very doubtful if the sore had been caused by a blow in April, 1936. Of course, the jury could judge the credibility of the witnesses, but the most favorable construction of the expert medical testimony does not support a verdict for $1,475. The verdict in this case is so clearly excessive as to indicate passion and prejudice of the jury. It is the duty and power of this court to set aside a verdict for damages so large that it does not find support in the evidence. A remittitur cannot be ordered, because it is impossible to segregate the excess of the amount of damages allowed, and it is necessary that the judgment be reversed and a new trial granted.

REVERSED.