ANN K. DUNN, APPELLANT, v. SAFEWAY CABS, INC., A CORPORATION, APPELLEE.

57 N. W. 2d 75

Filed February 13, 1953. No. 33252.

*Gaines & Crawford,* for appellant.

*Gross, Welch, Vinardi & Kauffman,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Douglas County by Ann K. Dunn, plaintiff, against Safeway Cabs, Inc., a corporation, defendant, to recover for personal injuries sustained by her through the negligence of the driver of one of the defendant's taxicabs. The case was tried to a jury resulting in a verdict in favor of the plaintiff and against the defendant in the amount of $4,500. The defendant filed a motion for new trial which was sustained. From the order granting the defendant a new trial the plaintiff appeals.

For convenience we refer to the parties as designated in the district court.

The record shows that the plaintiff is a registered

practical nurse. At the time of the accident she was 58 years of age, a widow, and self-supporting. During the evening of December 30, 1950, she called the defendant to have a cab sent to the Good Shepherd Convent, to be there at 7 a. m., the next morning. She had been employed as a house nurse at the Good Shepherd Convent for 11 months at a salary of $100 a month, board, room, and laundry. The cab arrived at the appointed time. The plaintiff left the main entrance of the convent on Fortieth Street which runs north and south. She was facing west. The home is on the east side of the street. Coming out of the door of the convent there is one step, then a group of about six or seven steps down to the sidewalk level. There are some side steps cut into the curb about a foot and one-half in height. The cab faced north to permit the passenger to get into the right rear seat of the cab. She had with her a small tin box, referred to as a suitcase in the evidence. This suitcase was about 30 inches long, approximately 18 inches high, and 12 inches in width, with a handle on the top. She was carrying it in her right hand. The cab driver did not get out of the cab, but from the driver's seat reached over and opened the door which swung back. She stepped into the line of entrance of the cab, and, after poising herself to step into the cab, she noticed it was moving backwards. When the cab started to move backwards, she found herself squeezed between the suitcase and the curb. The suitcase was pressed against the lower part of her limbs and the curb. When the cab driver noticed her predicament he got out of the cab, went around to the back of it, took hold of her shoulders, and endeavored to pull her out of the wedge. She testified that her limbs were tightly wedged. She asked him to push on the door and not to try to pull her out. He pushed on the door and she was able to extricate her limbs. After she extricated herself she either fell or sat down. She pulled her limbs back out of the wedge, and the cab driver helped her into the back seat of the cab. Her

pain was excruciating, and she had numbness in her limbs. She directed the cab driver to drive her to St. Bernard's Parish, which was two or three miles distant from the convent, to Monsignor Buckley's house. She had known Monsignor Buckley for a number of years. She was going there for the purpose of a visit and to relieve Miss Hite, the housekeeper, who contemplated going to the hospital for a few days. Upon arriving at Monsignor Buckley's house the cab driver carried her suitcase and helped her into the house. He made a statement that it was his fault, and that he had told the company when he left the garage that the brakes on the cab were not working. After a conference in the presence of Monsignor Buckley and Miss Hite, it was decided that the cab driver should take her to the hospital. He had radioed the defendant and was directed to take her to the Doctors Hospital. Her clothing and mesh stockings were damaged. From 30 to 45 minutes elapsed from the time she left the convent until the time she arrived at the hospital. When she arrived at the hospital she had one bad contusion on the outside of the right ankle and one contusion half-way up on her shin bone on the right leg, and she had injured toes. The injury to her toes was caused by being wrenched and turned down abruptly when she came in contact with the running board of the cab, causing a great deal of tissue damage to the left foot.

Dr. Quigley was at the hospital. He cleansed her ankle and limbs and applied sulfa ointment and bandaged them. She was at the hospital 30 to 45 minutes, and was told by the doctor to take aspirin or anacin. After completing the treatment Dr. Quigley took her back to Monsignor Buckley's house. Miss Hite went to the hospital later that day. The plaintiff prepared the meals for Monsignor Buckley with the assistance of two little neighbor girls who did various errands for her. Most of the time she sat with her feet propped up, and applied warm applications to the injured part of her

ankles and limbs three or four times a day. She went to Dr. Quigley on three occasions. The second time he took some X-rays and informed her that there was not much he could do for her. She went to him twice the second week, and once the third week following the accident. She became dissatisfied with his treatment and did not return. Dr. Quigley's X-rays disclosed there were no bones broken. He prescribed sulfa ointment which she put on with fresh bandages. She did not ask Dr. Quigley about being released. Dr. Quigley's services were paid for by the defendant.

After returning to Monsignor Buckley's house the plaintiff remained about 12 days. She read an ad in the newspaper, contacted the R. H. Montgomery residence, and sometime thereafter went to Montgomerys to attend to Mrs. Montgomery's mother who was elderly and bedfast. She received $25 a week and her keep. The patient passed away the 12th of February, 1951. She was in the Montgomery home from January 20, until she left in May. In the fore part of May, Mr. Montgomery suggested that she contact certain counsel, which she did. Her counsel sent her to Dr. Iwersen for treatment.

After leaving the Montgomery home she returned and kept house for Monsignor Buckley for about a week, in the same manner as she had previously. Miss Hite had gone back to the hospital for a few days. Thereafter she went to the home of Mrs. Collins to take care of her. She remained there 6 or 7 weeks, then went to Father Kellihers to stay. He was gone most of the time. She was there about a month. On July 22, 1951, she went to the A. S. Williams home to take care of Mrs. Williams. She was paid $35 a week until March 24, 1952. She attended Mrs. Williams as a practical nurse. When Mrs. Williams was taken to the hospital, her services were concluded. She had not worked from that time to the time of trial.

The plaintiff testified that due to the accident her ankles became swollen and the tissues and veins were

very prominent. She lost all power to stretch her toes or to move them up or down, and such condition still maintained two years after the accident. At the time of trial she had no power in her left foot and was unable to walk very far because she could not put weight on her toes. She further testified that her work required that she be on her feet a great deal of the time, and she was not able to do hospital work. Normally her pay as a practical nurse was $7 a day, but the pay scale at the time of trial was $8 a day.

Mrs. Montgomery testified that the plaintiff came to their home to care for her mother who was ill and bedfast. When the plaintiff arrived she was limping, and during the time she attended the patient both she and this witness would alternate in caring for the patient for the reason that the plaintiff required relaxation due to her condition. This witness further testified that after her mother passed away the plaintiff remained in their home for 2½ or 3 months without pay. Her limbs were swollen and it was necessary for this witness to apply hot packs to the plaintiff's limbs three or four times a day. The cleaning was done by a person called in for that purpose.

Martha Hite testified that she was the housekeeper at Monsignor Buckley's residence. She had known the plaintiff 5 or 6 years. The plaintiff was to relieve her, on the day of the accident, so that she could go to the hospital. She reiterated the facts with reference to the cab driver saying the brakes were bad. She also testified to the condition of the plaintiff when she arrived, that she was limping, was in pain, and that she went to the Doctors Hospital. Before the accident the plaintiff was very active and able to get around. This witness further testified that she herself went to the hospital that evening and remained about 3 weeks, and the plaintiff remained at Monsignor Buckley's residence until she came home. Again on April 23, 1951, the plaintiff replaced her when she took a trip home. At that time this

witness informed the plaintiff just to prepare something to eat, and inferred she should do no heavy work. When this witness returned the plaintiff was better, but she could not do much and did not walk like she had previously.

Dr. Iwersen testified that he was engaged in orthopedic work. He first saw the plaintiff as a patient on May 4, 1951. The history that the plaintiff gave the doctor was that she had been injured in an accident in December 1950. As a result of the accident she suffered bruises and sprains resulting in swelling of her feet and ankles. She complained of pain in her left foot more than in her right. The examination disclosed tenderness over the metatarsal phalangeal joints, which are the joints between the toes and the upper part of the foot. She had limitation of motion in these joints and some tenderness over the external malleolus. This is the bone which goes to make up the ankle joint. X-rays were taken of both her feet and ankles, and she was put on a course of treatment for what he diagnosed as metatarsalgia fibrosis of her feet. He gave her a lotion used for painful feet, and prescribed contrast baths, which is immersing the feet in hot and cold water alternately. He gave her exercises and massage for her ankles, and later prescribed metatarsal bars for her shoes to try to increase the motion in the metatarsal phalangeal joint and to relieve her of some of the pain she was having. She improved quite a bit. She still complained of pain in her left foot, especially at the first metatarsal phalangeal joint of her left foot. That is the large toe of her left foot. She had some rigidity there. He further testified that he believed she had reached her maximum improvement and was not going to get any better. She still complained of pain, and there was some stiffness which he did not believe would improve, and which condition would be permanent. He further testified that trauma to a foot, with a lot of soft tissue injury, will create fibrosis. There was some scarring of the soft

tissue and ligaments of the joint. Trauma to the joints aggravates any preexisting condition, and the fibrosis stiffens the foot causing a rigid foot. Metatarsalgia develops from trauma, or it may come from other things. The plaintiff might not have been bothered with it at the time, but could be in 3 or 4 years or more. She might have had some trouble later from arthritis, and very well could have in later years. He did not know what would happen, but trauma would be a contributing factor.

On cross-examination Dr. Iwersen was asked the question: "There is arthritis in that toe which you can tell by looking at it existed before the accident of which she complained, and even without an accident undoubtedly she will grow older like most of us and it will cause her more difficulty, isn't that a fair statement?" In answer thereto, he testified: "Surely, that is what I said, it might cause her trouble later." The farthest he could go was to say that maybe the accident flared up or aggravated something in the toe joint, and that was speculation. He was asked: "The arthritis around a joint causes irritation in the surrounding tissues and nerves; it is not in the joint itself where you have pain?" The doctor answered "Yes." He could not evaluate how much of it was there before the accident, but it was there. From the X-ray examination he could find nothing wrong except the pain from the chronic arthritis in the big toe. As to the right foot, there was nothing wrong with that foot or ankle except a little arthritis in the big toe which did not bother her and she had not complained about it. There were no fractures and no dislocations, or limitation or restriction of motion in the right foot. At the original examination there was no displacement of tendons and ligaments, and no dislocation of the bones.

The doctor further testified that he would consider she had fairly normal feet for someone her age, both feet and ankles, outside of the big toe. He did not re-

call at any time that he saw her that her ankles and feet were swollen. He did not see any indication of lack of circulation in that area. She had a good dorsal-pedal pulse in her feet. He was asked: "There was good circulation in both ankles and the feet, and blood, of course, nourishes the nerves and the tissues, there is good sensation and all of that, isn't that a fair statement, Doctor?" He answered: "Yes, approximately, I think."

The plaintiff contends that the district court erred in vacating and setting aside the verdict of the jury rendered in favor of plaintiff and against the defendant and the judgment entered thereon; in sustaining defendant's motion for new trial; and that the action of the district court in so doing constitutes an abuse of discretion.

The defendant corporation does not deny that plaintiff is entitled to recover compensatory damages for the injuries she sustained as a proximate result of the negligence of the defendant's driver. The contention of the defendant is that the amount recovered as damages is grossly excessive and such as to shock the conscience of the court; and that while the court did not express the reason for granting a new trial, it was obvious under the evidence that the court believed the amount of the recovery was excessive.

With reference to the granting of a new trial, the district court has the power and is required to consider and determine motions for a new trial by the exercise of its judicial discretion. In doing so the court must be governed and guided by applicable law, that is, the application of the statutes and legal principles to all the facts in the case. While the trial court need not give his reason for reaching a decision, the justification of the decision must be one established from the record. See Greenberg v. Fireman's Fund Ins. Co., 150 Neb. 695, 35 N. W. 2d 772.

While there is no fixed or exact rule known or recognized in our system of jurisprudence in which the same measure of damages for personal injuries may be applied

to all cases alike, as has often been said, much is left to the good sense and reason of the man in the jury box. The law gives to the jury the right to determine the amount of recovery in cases of personal injury. That is, of course, one of its functions, and, if the verdict is not so disproportionate to the injury as to disclose prejudice and passion, it will not be disturbed. See, Remmenga v. Selk, 152 Neb. 625, 42 N. W. 2d 186; Rueger v. Hawks, 150 Neb. 834, 36 N. W. 2d 236; Horky v. Schroll, 148 Neb. 96, 26 N. W. 2d 396; Thoren v. Myers, 151 Neb. 453, 37 N. W. 2d 725.

The foregoing constitutes a general rule of practice. However, there is another rule which gives the trial court the power to set aside a verdict if, from the evidence adduced, it appears that the verdict is so exorbitant and excessive as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or it is clear that the jury disregarded the evidence or rules of law. See, Rueger v. Hawks, *supra;* Horky v. Schroll, *supra;* Remmenga v. Selk, *supra.* In the afore-cited cases the verdict of the jury was not set aside, but the rule for setting aside a verdict and granting a new trial was stated.

In the instant case, on May 4, 1951, when the plaintiff went to Dr. Iwersen she complained of tenderness on the right external malleolus when she stood on her feet for an extended period of time. His examination of the muscles in her ankles and legs showed that they were good, and there was no limitation of motion or stiffness in the ankles and legs. There was of the feet. That is the reason he prescribed the metatarsal bars. The treatment he rendered was for her feet. According to the doctor's testimony, the motion was good in all directions. There was some tightening of the muscles and tendons, however that did not limit the motion of the ankle and legs. There was no loss of sensation, no numbness, no lack of feeling, and no swelling. He found nothing wrong with the boney structure of the foot, no

fracture, and no dislocation of any of the ·bones of the toes. In the large toe of her left foot she had chronic arthritis which she had before the accident. The sensory nerves and reflexes were good. The doctor was rather indefinite as to what extent the accident aggravated the chronic arthritis in her big toe on the left foot. The circulation in the ankle was not affected. While there is some evidence that her condition which existed when he finished treating her was permanent, this must by necessity refer to the chronic condition of arthritis as he found it in the big toe of her left foot.

Dr. Iwersen saw the plaintiff on five occasions over a period of 9 months, first on May 4, 1951, then on June 8, July 11, and August 10 of that year, and on February 9, 1952. For the medical services rendered he charged her $50, and an additional $100 to testify as an expert witness.

It also appears from the record that there was little loss of earnings, if any. The plaintiff had been employed at the convent for $25 a week, board, room, and laundry. She then relieved her friend Miss Hite to keep house for Monsignor Buckley and, as the evidence shows, worked for the Montgomerys at $25 a week. She took care of Mrs. Collins for the same amount, and Mrs. Williams for $35 a week.. In other words, she continued to earn as much after the accident as she had earned 11 months previous thereto.

The injuries the plaintiff received were painful and had remained so to some extent as testified to by Dr. Iwersen, but at the time of the trial, according to the doctor's testimony, the plaintiff had fairly normal feet for a person of her age.

When it appears from the record that the verdict in a case is so clearly exorbitant or excessive as to indicate that it was the result of passion, prejudice, or mistake, or some means not apparent in the record, or it is clear that the jury disregarded the evidence or rules of law, then it is the duty and power of the trial court and of

this court to set aside a verdict for damages so large that it does not find support in the evidence. See, Rich v. Dugan, 135 Neb. 63, 280 N. W. 225; Snyder v. Russell, 140 Neb. 616, 1 N. W. 2d 125; Trute v. Holden, 118 Neb. 449, 225 N. W. 238.

It is true, as the plaintiff asserts, this court has recognized that in actions such as this the jury may take into consideration the purchasing power of money with respect to commodities that are in use by the public generally and can be said to constitute necessaries of life, and this factor may be taken into consideration in determining whether or not the verdict rendered by a jury is so grossly excessive as to justify the granting of a new trial under the governing rules of law.

The rule is well settled that in this class of cases it properly comes within the province of the jury to take into account the purchasing power of money with respect to the commodities that are in use by the public generally and that may reasonably be said to constitute the necessaries of life. See, Dailey v. Sovereign Camp, W. O. W., 106 Neb. 767, 184 N. W. 920; Lincoln Gas & E. L. Co. v. City of Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968. There are other cases to the same effect unnecessary to cite.

We are cognizant of the fact that the purchasing power of money is less today than in the past few years and give recognition to that fact. However, after giving careful consideration to the facts and circumstances of this case, we believe the verdict in this case is so clearly exorbitant as to indicate that it was the result of passion, prejudice, mistake, or that it is clear that the jury disregarded the evidence or controlling rules of law.

For the reasons heretofore given in this opinion, we conclude that the trial court was not in error in granting a new trial in this case. Having so held, other assignments of error need not be discussed.

We affirm the judgment of the trial court.

AFFIRMED.

WENKE, J., dissenting.

I cannot agree that the record presents a situation which makes the verdict of $4,500 rendered by the jury so exorbitant or excessive as to indicate that it was the result of passion, prejudice, or mistake, or that it is clear that the jury disregarded the evidence so as to give the trial court the power to set it aside.

When a party has succeeded in securing a verdict of a jury on the facts in issue he is entitled to keep it unless there is prejudicial error in the proceedings by which it was secured. If, after a verdict is obtained, a motion for new trial is made which finds no legal reason in the record to support it the trial court has no judicial discretion in ruling thereon but must deny it. See Greenberg v. Fireman's Fund Ins. Co., 150 Neb. 695, 35 N. W. 2d 772.

Admittedly appellee was liable. The only question presented was the amount appellant was entitled to recover. To determine what the amount should be was the function of the jury and one with which we have no right to interfere as being excessive if there has been evidence adduced sufficient to support it. As stated in Greenberg v. Fireman's Fund Ins. Co., *supra:* "That (the) rule does not authorize the district court to invade the province of the jury and to set aside the verdict and grant a new trial because the court arrived at a different conclusion than the jury on the evidence that went to the jury."

In this regard the appellant, since she recovered the verdict, is entitled to have the evidence adduced considered in the light of the following: "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." Borcherding v. Eklund, *ante* p. 196, 55 N. W. 2d 643.

While there is evidence in the record to support a

finding that appellant suffered loss of earnings, had a moderate amount of medical expense, and has some permanent conditions which, with reasonable certainty, the evidence shows will at least cause her pain and inconvenience in the future, if not some disability, this dissent will not consider those items further. What is herein of primary concern is the pain which appellant suffered as a consequence of the injuries received and the suffering arising therefrom during the period between the date of the accident, December 31, 1950, and the date of the trial which began on April 16, 1952, or a period of about 15½ months.

Appellant is a registered practical nurse. At the time of the accident she was a widow, 58 years of age, and self-supporting. The type of work she performed required that she be on her feet a good deal of the time. Prior to the accident she testified she had never experienced trouble with her feet and ankles.

From the evidence adduced the jury could have found: That the immediate result of the accident was injury to appellant's feet and lower limbs consisting of several severe bruises resulting in complete discoloration and severe swelling, and severe injury to the toes of her left foot; that these injuries caused her immediate excruciating pain; that the swelling, discoloration, and bruises, although treated, remained for months and continued to cause her to suffer severe pain; that because of this suffering she was unable to sleep; that her condition made standing or walking difficult and painful, making it necessary for her to rest often and walk with a limp; that because of this condition she became nervous; that after some 4 months this condition began to improve as a result of the treatments she took but she still continued to suffer pain and the inconvenience of not being able to be on her feet for any length of time and continued to have difficulty sleeping; that her left foot, because of the injuries thereto, became stiff and made walking difficult and tiring; and that these conditions continued

to exist at the time of the trial some 15½ months after the accident, although in a lesser degree.

As stated in 25 C. J. S., Damages, § 93, p. 641: "There is no standard by which physical pain and suffering may be measured and compensated for in money."

And as stated in Remmenga v. Selk, 152 Neb. 625, 42 N. W. 2d 186: "In an action for damages, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the sound discretion of the jury, and the courts are reluctant to interfere with a verdict so rendered."

Taking into consideration the pain, suffering, and inconvenience which the evidence shows this appellant suffered during the 15½ months which resulted from appellee's admitted fault, I think the verdict is sustained by the evidence, especially when the other items are included. This is particularly true when these elements are considered in the light of the rule: "* * * that in this class of cases it properly comes within the province of the jury to take into account the purchasing power of money with respect to the commodities that are in use by the public generally and that may reasonably be said to constitute the necessaries of life." Dailey v. Sovereign Camp, W. O. W., 106 Neb. 767, 184 N. W. 920.

As stated in the majority opinion, there are other reasons assigned by appellee why the ruling of the trial court was correct. Since the majority opinion does not discuss them and it is not based thereon this dissent will not in any way deal with the merits thereof. It is directed solely to the grounds upon which the majority opinion is based, that is, the sufficiency of the evidence adduced to support the verdict of the jury.

CHAPPELL, J., joins in this dissent.